**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                        Crim. No. 24-539 DHU

**LABAR TSETHLIKAI**,

      Defendant.

**UNITED STATES' RESPONSE**
**TO DEFENDANT'S EMERGENCY MOTION TO STAY**

This matter comes before the Court on Defendant's fourth[1] attempt to delay this matter from marching toward trial. Styled as "Mr. Tsethlikai's Emergency Motion to Stay Proceedings," Doc. 101 ("Motion"), Defendant, while actively filing every template motion he can get his hands on, yet again attempts to delay justice, this time under the guise of the government shutdown.[2] Defendant's constant attempts to block this case from proceeding should be quashed and the Motion should be denied.

## I.    BACKGROUND

### A.  **Procedural History**

On April 25, 2024, a federal grand jury charged Defendant with a single count of second-degree murder in violation of 18 U.S.C. §§ 1153 and 1111.

On July 31, 2024, a federal grand jury returned an 11-count superseding indictment, charging Defendant with kidnapping resulting in death, first-degree murder, first-degree felony murder, kidnapping resulting in death, kidnapping, assault with intent to commit murder, assault

---

[1] The United States is being conservative in this estimate. Defendant first opposed designating this case as complex and entering a scheduling order in December 2024. Defendant then filed his first emergency motion to stay his presentation of mitigation evidence. More recently, Defendant claims that he needs years to prepare a defense.
[2] This is Defendant's second "Emergency" motion to delay the matter from proceeding against him.

resulting in serious bodily injury, aggravated sexual abuse, and kidnapping in violation of 18 U.S.C. § 1201(a)(l) and §§ 1153, 1111, 1201(a), 113(a)(1), 113(a)(6), and 2241. Doc. 24 ("Superseding Indictment"). The Superseding Indictment included in relation to the Count 1 kidnapping resulting in death charge, a "Notice of Special Findings" under 18 U.S.C. §§ 3591 and 3592. These findings, which are made in support of a sentence of death, included, among other things, information about Defendant's prior criminal convictions, premeditation, and that the offense was committed in an especially heinous, cruel, or depraved manner. *See* Superseding Indictment. Given that the Superseding Indictment carried a potential penalty of death, the Court appointed learned counsel on August 6, 2024, in accordance with 18 U.S.C. § 3005. Doc. 27.

On December 18, 2024, a federal grand jury returned a "Second Superseding Indictment," charging 17 counts that correspond to 11 John Does: Count 1: 18 U.S.C. § 1201(a)(1): Kidnapping Resulting in Death; Count 2: 18 U.S.C. §§ 1153 and 1111: First Degree Murder; Count 3: 18 U.S.C. §§ 1153 and 1111: First Degree Felony Murder; Count 4: 18 U.S.C. §§ 1153 and 1201(a): Kidnapping Resulting in Death; Counts 5, 6, 9, 11, 13, and 14: 18 U.S.C. §§ 1153 and 1201(a): Kidnapping; Count 7: 18 U.S.C. §§ 1153 and 113(a)(1): Assault with Intent to Commit Murder; Count 8: 18 U.S.C. §§ 1153 and 113(a)(6): Assault Resulting in Serious Bodily Injury; Count 10: 18 U.S.C. §§ 1153, 2241, and 2246(2)(B): Aggravated Sexual Abuse; Count 12: 18 U.S.C. §§ 1153 and 113(a)(3): Assault with a Dangerous Weapon; and Counts 15, 16, and 17: 18 U.S.C. § 1201(a)(1): Kidnapping. Doc. 52. The Second Superseding Indictment, likewise, includes an identical "Notice of Special Findings" section in relation to Count 1.

On September 23, 2024, the United States met with the defense team in person at the United States Attorney's Office in Albuquerque, New Mexico. There, the defense team summarily requested a Summer 2025 presentation of mitigation evidence. Learned counsel also made clear

at this meeting that she had worked on several federal death penalty cases and that she knew the process.

On September 30, 2024, the United States notified the defense team that it would set aside the week of December 1, 2024, for Defendant's presentation of mitigation evidence to the United States Attorney. On December 6, 2024, Defendant proffered his mitigation evidence. During this time, Defendant was repeatedly advised in writing by the United States on the applicable Justice Manual provisions and that the Attorney General for the United States makes the final determination on whether to seek the death penalty.

On December 20, 2024, the United States moved to designate the case as complex. Doc. 56. Defendant opposed the complex case designation and requested only that the trial be continued. *Id*.; *see also* Doc. 58. Therein, Defendant made clear that he understood that all capital decisions made under the Justice Manual are conditioned upon the DOJ and the Attorney General's discretion, *i.e.*, "hinge on the outcome of the DOJ decision-making process." *See* Doc. 58 at 5; *see also id*., *passim*. In sum, defense counsel's position was that the case should essentially be held in abeyance under the mistaken belief that Defendant would receive an expedited no seek decision from the Attorney General. *See id*. At that time, Defendant's position was that he did not need nor want a case schedule.

On January 22, 2025, the Court held a hearing on the United States' Opposed Motion to Designate the Case as Complex. *See* Docs. 57 and 60. There, the Court designated the case as complex, continued the trial for 90 days, and set a status conference for February 25, 2025. *See* Docs. 60 (Clerk's Minutes), 61 (Order Granting United States' Motion), and 62 (Order to Continue). During the February 25, 2025, status conference, the United States informed the Court that the Capital Review Committee had not yet reached a determination on whether to seek the death penalty. The United States then requested a 30-day deadline to submit a proposed complex

case schedule.  Defense counsel objected on the basis that a determination had not yet been made

by the Capital Review Committee and, in furtherance of the objection, requested a 60-day deadline

to submit a proposed scheduling order, and the Court agreed with Defendant.  Doc. 63 (Clerk's

Minutes).

Shortly after, the Capital Review Committee offered Defendant an opportunity to present

additional mitigation evidence and requested that the United States coordinate with Defendant as

to possible dates for the conference.  Defendant was advised that three dates were available in

March and April: March 24, 2025, April 7, 2025, and April 21, 2025.  Defendant refused those

dates, claiming that he needed until June or July 2025 at the earliest.  Defendant was then informed

that while the United States could offer certain later dates, it would not accommodate as significant

a delay as Defendant requested, and he was provided additional dates:  May 5, 2025, May 12,

2025, and May 19, 2025.

On March 11, 2025, Defendant filed a "Sealed Emergency Motion for Scheduling Order

Directing that the Presentation of Mitigation Evidence Take Place no Sooner than July 2025."

Doc. 64.  Therein, Defendant moved under "18 U.S.C. § 3005, Guidelines for the Administration

of Criminal Justice Act, the Eighth Amendment, and its inherent Article III authority for a

scheduling order directing that the presentation of mitigation evidence to the Department of

Justice's Capital Review Committee under DOJ's capital review process take place no sooner than

July of 2025."  *Id*.  The Court denied Defendant's attempt to stall the case from proceeding.  Doc.

70.

On June 27, 2025, the United States filed a "Notice of Intent to Seek the Death Penalty

Pursuant to Title 18 United States Code Section 3593."  Doc. 75.  As the title indicates, the United

States informed Defendant "that the circumstances of the offense charged in Count One of the

Second Superseding Indictment are such that, in the event that Defendant is convicted of this offense, a sentence of death is justified, and the government will seek the sentence of death." *Id.*

Shortly after the Notice of Intent to Seek, on July 3, 2025, the United States filed an "Unopposed Motion for a Status Conference." Doc. 77. There, the United States reiterated the following procedural history:

1. On December 20, 2024, the United States filed an Opposed Motion to Designate Case as Complex (the "Motion"). *See* Doc. 56. The Motion requested that the parties be permitted to submit a joint scheduling order for review and acceptance by the Court.

2. The Court granted the Motion and designated this case as complex on January 23, 2025. *See* Doc. 61.

3. On February 25, 2025, a status conference was held and the Court set a proposed scheduling deadline 60 days from the date of the hearing. *See* Doc. 63. However, it was the understanding of undersigned counsel for the United States that the scheduling deadline was contingent on the case's death penalty status, and should the case be certified as eligible for the death penalty, another status conference would be set to further discuss a joint scheduling order with the parties.

4. The United States was directed by Attorney General Pamela Bondi on June 27, 2025, to seek the death penalty in this case, and the United States filed its Notice of Intent to Seek the Death Penalty Pursuant to Title 18, United States Code, Section 3593 that same day. *See* Doc. 75.

5. Currently, this case is scheduled for trial on September 8, 2025, with a pretrial motion deadline of July 4, 2025, and other trial deadlines falling in August. *See* Doc. 74.

6. The United States now respectfully requests that the Court schedule a status conference and that the parties be permitted to submit a joint scheduling order for review and acceptance by the Court.

7. Defendant does not oppose the relief sought in this motion and requests that the status conference be held on July 23, 2025, or July 25, 2025.

*Id.*

In response to this request, on July 23, 2025, the Court held a status conference. Doc. 82. At the conference, Defendant again attempted to delay this matter from

proceeding and opposed the entry of a scheduling order. *Id*. Among many assertions, including the extraordinary claim that capital cases take years and years before they go to trial, Defendant complained that budget constraints require this matter to remain in a holding pattern, with another status conference set three months out. The United States opposed this request and again sought a scheduling order. The Court declined at that time to initiate the litigation or set any deadlines or trial date and instead set a status conference for October 20, 2025.

Given this posture, on August 6, 2025, the United States moved for the "Court to Issue a Scheduling Order and Set a Trial Date." Doc. 85. In that request, "the United States stressed the necessity of issuing a scheduling order to address the unique issues attendant to a capital matter. Concomitantly, the United States requested [at the status conference] that the Court set this matter for trial in approximately 18 months, a timeframe that, in the Government's view, is sufficient for the parties to robustly litigate any pre-trial claims." *Id*.[3] The United States further memorialized Defendant's position: "counsel for

---

[3] The United States further noted that,

> [i]n analogous capital prosecutions, the courts have entered scheduling orders soon after the government's filing of the Notice of Intent to Seek the Death Penalty. For example, in *United States v. Dylann Storm Roof*, Crim. No. 2:15-472 (D. S.C.), a hate crime capital prosecution stemming from the defendant's murder of nine African-American parishioners engaged in religious activities at the Mother Emmanuel Church in Charleston, South Carolina, the United States filed the Notice of Intent to Seek the Death Penalty on May 24, 2016, and the court entered Scheduling Orders on June 7 and June 9, 2016. *See* Doc. 179 and 180. In *Roof*, the crime occurred on June 17, 2015; the Notice of Intent was filed on May 24, 2016; and Jury Selection began on November 28, 2016. Accordingly, the case was brought to trial within 17 months . . . Similarly, in *United States v. Dzhokhar Tsarnaev*, Crim. No. 1:13-10200 (D. Mass), a capital prosecution stemming from the defendant and his brother detonating two bombs at the Boston Marathon (killing three spectators and injuring hundreds more) and the subsequent killing of a police officer, the United States filed the Notice of Intent to Seek the Death Penalty on January 30, 2014, and the court entered a Scheduling Order on February 12, 2014. See Doc. 172. That crime occurred on April 15, 2013; the Notice of Intent was filed on January 30, 2014; and jury selection began on January 5, 2015. Accordingly, the case was brought to trial within 21 months.

Doc. 85 at 3.

the defendant argued that an 18-month timeframe was unrealistic; instead, the defendant suggested that, in his view, the horizon for trial extended past 40 months.  The primary basis the defendant cited to support this remarkably long estimate was 'budgetary constraints' that, upon information and belief, are temporarily delaying payment to CJA counsel and expert witnesses.  Based on that, the defendant requested that the Court forego entering a scheduling order, delay setting a trial date, and reset the status conference in October 2025 when those issues could be re-visited." *Id*.  This Motion is still pending.

**B.  Defendant's Motion Practice after the Notice of Intent to Seek the Death Penalty**

Shortly after representing to the Court that Defendant cannot proceed with a case schedule at this time, Defendant employed his hold with the hare run with the hounds strategy.  First, on August 5, 2025, Defendant propounded a Discovery Letter, blindly demanding items that had already been produced.  Second, on August 22, 2025, Defendant filed a "Motion for Informational Outline of Alleged Aggravating Factors," clamoring for items related to the penalty phase of litigation—the very phase of the litigation Defendant claims he cannot prepare for because of budgetary hurdles.  Doc. 87.  And the very phase that involves conduct of which Defendant had already been provided a detailed accounting of.  Third, on September 12, 2025, Defendant filed a "Motion to Compel Discovery," memorializing the scattershot Demand letter sent a month prior. Doc. 92.  But Defendant was not done.

**C.  Defendant's Motion**

On October 1, 2025, Defendant filed the instant Motion.  In support of his newly minted delay attempt, Defendant claims that, as a result of the federal government shutdown, "[l]earned [c]ounsel and critical defense experts must severely limit or pause their representation of Labar Tsethlikai, leaving him stripped of rights guaranteed to him by the United States Constitution." Mot. 1.  According to Defendant, "no member of his team will be paid for their work – not

attorneys, learned counsel, investigators, mitigation specialists, paralegals, or experts." *Id.* at 2. Defendant then tethers several arguments to this shaky foundation, for example: (1) the "defense cannot operate without learned counsel and/or mitigation experts," and (2) "death is different." *Id.*, *passim*.

## II.    ANALYSIS

At the outset, the United States deems it important to address Defendant's attempt to smuggle an elephant through a keyhole: the Federal Public Defender's Office has not filed a similar motion in any other criminal case in this District.  Given the reliance on the Sixth and Eighth Amendments, one would think that the Federal Public Defender's Office would be obligated to file this request in all criminal cases—yet not one similar motion has been filed in any other criminal matter.  Apparently, Defendant, even at this pretrial stage in the litigation, enjoys better protections than other defendants in this District—or Defendant is merely punching at ghosts.[4]

Moreover, Defendant's arguments yet again concern the penalty phase of the case.  At the risk of stating the obvious, we do not even have a scheduling order for the guilt phase, but all arguments are still grounded in a sentencing that is contingent upon an unknown outcome at the guilt phase.  So, what is there to stay?  Even if a scheduling order had already issued, the remedy would be a motion to enlarge the impacted deadline or to continue the sentencing for a period of time after the guilt phase, but not to stay the case.  Defendant's arguments are premature at best and posturing at worst—that is, we have progressed from the fear of a scheduling order to outright fear of the case itself.

With this, the United States will address Defendant's arguments in turn.

---

[4] The United States conducted a cursory review of the dockets of approximately 23 death penalty cases filed since 2017 and only one case mentions the 2018/19 shutdown. There were no motions filed like the instant Motion—the other cases simply continued with business as usual.

### A. Defense Counsel is being Compensated for their Work

A major theme running throughout the Motion is defense counsel's illusory aversion to "uncompensated" work. As defense counsel and the federally funded United States Attorney's Office staff know, federal law requires that all federal employees receive back pay for work that occurs during a government shutdown. It appears that defense counsel believes that bi-weekly pay is the governing, foundational principle that the 1st United States Congress envisioned when it crafted the Bill of Rights. And future, guaranteed backpay causes unspeakable violence to the Sixth and Eight Amendments. Therefore, a stay of the proceedings is warranted, if not, required under the Constitution unless that bi-weekly pay continues (or interim CJA vouchers are not disrupted).[5] This strained reasoning must be rejected. Defense counsel is obligated as federal salaried employees appointed to this matter to do their job, and learned counsel willingly accepted a Court appointment to be on this capital case with full knowledge of how federal funding measures work and the potential impact on voucher payments; therefore, the defense team is required to continue advocating for Defendant regardless of the temporary, fleeting lapse in appropriations. The "emergency" created by a lapse in federal funding relates to concerns over future appointments, that is, panel attorneys refusing to accept cases based on delayed compensation, which in turn could result in Speedy Trial Act violations, and not the bootstrapped "emergency" manufactured by already appointed defense counsel on a case that still does not have a trial date or scheduling order.[6]

---

[5] CJA panel attorneys, like learned counsel in this capital matter, can receive interim payments of compensation and expenses. But there is not a right to regular, bi-weekly or even monthly pay. Compensation for work performed in this case will be paid. Defense counsel seems to believe that they will have to work for free if the case is not stayed. Commonsense and the law tells us otherwise.

[6] Per uscourts.gov:

> During recent congressional testimony, St. Eve said, "These disruptions in panel attorney payments negatively affect our panel attorneys, potentially reducing their willingness to accept future appointments and jeopardizing the ability to provide necessary and timely representation" . . . For

A brief review of uscourts.gov confirms this understanding.  "Before the enactment of the Criminal Justice Act (CJA), [] there was no authority to compensate appointed counsel for their services or litigation expenses, and federal judges depended on the professional obligation of lawyers to provide pro bono public representation to defendants unable to retain counsel." https://www.uscourts.gov/about-federal-courts/defender-services.  "Criminal Justice Act (CJA) panel attorney funds were depleted around July 3, 2025. However, the Administrative Office of the U.S. Courts' Defender Services Office was recently able to deobligate and make available an additional $8.5 million to the panel attorney line permitting an additional batch of payments to be made on Sept. 18, 2025. Once that batch is fully processed, remaining panel attorney payments will continue to be deferred until additional funding is available . . .  Please continue to file, process, and approve CJA vouchers as normal during the payment deferrals *so that payments can be disbursed as soon as funding becomes available*."   https://www.uscourts.gov/about-federal-courts/defender-services/cja-panel-attorney-funds-information-fy-2025.

As a final point, contrary to the representations made in the "emergency" Motion, the Courts and the Federal Public Defender's Office are still being funded.  On October 1, 2025, the Federal Judiciary issued the following release, which applies to the Federal Public Defender:

> The Judiciary initially confirmed that it could continue paid operations through Oct. 3, adding that it was assessing whether there were sufficient funds to support operations beyond that date. *The assessment identified available fees and balances to pay for an additional two weeks*.

> If the shutdown continues after Judiciary funds are exhausted, the courts will then operate under the terms of the Anti-Deficiency Act, which allows work to continue during a lapse in appropriations if it is necessary to support the exercise of Article

---

example, in the District of North Dakota, several long-tenured CJA attorneys recently resigned from the panel. The concern among many federal courts is that attorneys will decline appointments and trials will have to be postponed, leaving some defendants detained for longer than necessary or even compromising criminal cases if requirements under the Speedy Trial Act cannot be met.

https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay.

III judicial powers. Under this scenario, each court and federal defender's office would determine the staffing resources necessary to support such work.

https://www.uscourts.gov/data-news/judiciary-news/2025/10/01/judiciary-still-operating-shutdown-starts.

It is worth noting that as of the date of this filing, the only people currently not being compensated for their work are members of the Government team, who have gone without pay since October 1, 2025, the beginning of the government shutdown. However, the Government team will be paid retroactively.[7]

### B. Defendant Misstates the Concept of "Death is Different"

Here, Defendant attempts to use the oft-quoted "death is different" language as a catchall in support of his stay request. Defendant states that, "although the issues raised in this pleading are, in varying degrees, applicable to non-capital cases, they must be analyzed here through a 'death is different' lens and do not have the same impact outside the capital context." Mot. 8. But the Eighth Amendment only guarantees individualized sentencing to defendants facing the death penalty because "death is different." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). It does not give Defendant a special, wild card argument to dictate the case schedule.

Though the Supreme Court has indeed recognized the qualitative difference between death and alternative forms of punishment, the principle has been articulated and applied in precise contexts, and has never been understood to color capital proceedings in the all-encompassing manner suggested by Defendant. The "death is different" concept was introduced by the Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The Court in *Woodson*, noting

---

[7] Retroactive pay is provided though 31 U.S.C. § 1341 – amended by the Government Employee Fair Treatment Act of 2019 (Public Law 116-1, January 16, 2019) – for Federal employees affected by a lapse in appropriations as soon as possible after the lapse in appropriations ends, regardless of scheduled pay dates, and subject to the enactment of appropriations Acts ending the lapse. 31 U.S.C. § 1341(c)(2).

the qualitative difference between the penalty of death and a sentence of imprisonment, struck down North Carolina's mandatory death penalty statute. To satisfy the need for heightened reliability in capital sentencing, the Court reasoned, the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense. Defendant's claim that the "death is different" notion triggers heightened standards of reliability, review, and scrutiny at every stage of a capital case misapprehends the law and superimposes amplified standards on the deliberate procedures prescribed by the Federal Death Penalty Act ("FDPA") scheme. The requirement of heightened reliability in capital proceedings is, contrary Defendant's suggestion, satisfied by the various procedural safeguards imposed by the applicable capital sentencing scheme. *See California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("[T]he Court's principal concern has been more with the procedure by which the State imposes the death sentence than with the substantive factors the State lays out before the jury as a basis for imposing death.").

The FDPA, for instance, dictates a scheme that both narrows the class of offenders eligible for the death penalty and provides for precise, enhanced sentencing procedures that ensure heightened reliability is achieved through guided discretion and individualized sentencing. *See* 18 U.S.C. § 3593. To impose a sentence of death under the FDPA, the jury must (1) find the defendant guilty of a capital-eligible offense; (2) find the defendant eligible for the death penalty by finding, beyond a reasonable doubt, one of the requisite "intent" requirements set forth in § 3591(a)(2)(A)-(D) and at least one of the statutory aggravating factors set forth in § 3592(c)(1)-(16); (3) consider any mitigating factors; and (4) weigh the factors to determine whether death is justified. The concern first expressed by the Court in *Woodson* regarding individualized sentencing is thus reflected and fulfilled by the various procedural protections built into the federal capital sentencing scheme.

The Supreme Court has never indicated that the qualitative distinction between the death penalty and alternative available sentences confers additional rights upon a defendant or mandates that the fundamental levels of scrutiny generally applicable to criminal cases need be revisited or enhanced.  To the contrary, countless aspects of capital trials are indistinguishable from their non-capital counterparts.  The nature of the right to counsel, for instance, is not altered in capital cases, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("For purposes of describing counsel's duties . . . Florida's capital sentencing proceeding need not be distinguished from an ordinary trial."), nor is the analysis for the admissibility of evidence, *see Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) ("We established that the 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context." (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990))).  The "death is different" concept is instead manifested in the deliberately designed, heightened procedural requirements that uniquely characterize capital sentencing schemes.  *See, e.g.*, 18 U.S.C. § 3593.  Like many of the death penalty statutes reenacted post-*Furman*, the FDPA has never been found unconstitutional by a Court of Appeals. *See, e.g., United States v. Fields*, 516 F.3d 923 (10th Cir. 2008); *United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006); *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004); *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).  Therefore, insofar as he maintains that every stage of a capital case must be marked by heightened standards of reliability, review, and scrutiny, Defendant misconstrues the Supreme Court's directive, driven by the notion that "death is different," that capital sentencing schemes encompass specified, enhanced procedural requirements.

Or put in more straightforward terms, what cannot be different, death or otherwise, is the United States' obligation to prosecute a Defendant for his conduct.  And the Crime Victims' Rights Act grants victims "[t]he right to proceedings free from unreasonable delay," which can be asserted

by an "attorney for the Government." 18 U.S.C. §§ 3771(a)(7) and (d)(1).  The United States has asserted this request repeatedly, and does so again.

Defendant's "death is different" assertion grants him no relief here.

### C.  Defendant still has not Identified One Expert who cannot be Retained

Defendant next basis in support of his delay tactic can likewise be disregarded.  According to Defendant, "[t]he defense team has identified, vetted, and met with several experts who are critical to his defense, but because of the lack of CJA funds and the fact that the Federal Defender Office has no money in its budget for additional experts, the defense team is not able to move forward with retaining these experts. Without funding, the defense team also lacks the ability to pay the experts it has already hired for their work."  Mot. 11.[8]

Yet, Defendant does not allege that he has made an *ex parte* application for CJA funds for an expert witness or mitigation specialist. Nor does he allege that defense counsel has submitted invoices that have not been paid in this case in light of the above information from uscourts.gov. Essentially, he is speculating that a request may be denied in the future. Such speculation is not grounds to support entry of a stay. *See, e.g.*, *United States v. Solon*, 596 F.3d 1206, 1210 (10th Cir. 2010) (finding no CJA violation because "the district court never actually denied a funding request."). Instead of granting immediate relief for the defendant's inchoate claim, the Court instead should enter the scheduling order, set a trial date, and address any issues related to the "budget constraints" if and when they ripen.  And if and when they actually present a problem with a case schedule.

---

[8] How can the defense on one hand represent they have already retained experts who are critical to the defense, and that those experts have already been working on the case, but on the other make every attempt to avoid a trial date and a case schedule?  Delay is not a valid defense.

### III.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the

Motion.

Respectfully submitted,

RYAN ELLISON
Acting United States Attorney

*/s/ Electronically filed on October 9, 2025*
MATTHEW J. McGINLEY
JACK BURKHEAD
Assistant United States Attorneys

I HEREBY CERTIFY that on October 9, 2025,
I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system,
which will cause a copy of this filing to be sent
to counsel for Defendant.

*/s/*_____
MATTHEW J. McGINLEY
Assistant United States Attorney

15