UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                              CR 1:24-00539 DHU

LABAR TSETHLIKAI,

    Defendant.

**MEMORANDUM OPINION AND ORDER ON
<u>DEFENDANT'S EMERGENCY MOTION TO STAY PROCEEDINGS</u>**

**THIS MATTER** is before the Court on Defendant's Emergency Motion to Stay Proceedings ("Motion"). Doc. 101. The Motion is fully briefed. Having reviewed the parties' pleadings, arguments, the applicable law, and all of the circumstances surrounding the issues raised, the Court **GRANTS** Defendant's Motion.

**I. BACKGROUND**

On April 25, 2024, a federal grand jury charged Defendant with a single count of second-degree murder in violation of 18 U.S.C. §§ 1153 and 1111. On July 31, 2024, a federal grand jury returned an 11-count superseding indictment, charging Defendant with kidnapping resulting in death, first-degree murder, first-degree felony, kidnapping resulting in death, kidnapping, assault with intent to commit murder, assault resulting serious bodily injury, aggravated sexual abuse, and kidnapping in violation of 18 U.S.C. § 1201(a)(l) and §§ 1153, 1111, 1201(a), 113(a)(1), 113(a)(6), and 2241. Doc. 24 ("Superseding Indictment"). The Superseding Indictment included in relation to the Count 1 kidnapping resulting in death charge, a "Notice of Special Findings" under 18 U.S.C. §§ 3591 and 3592. These findings, which are made in support of a sentence of death, included, among other things, information about Defendant's prior criminal convictions, premeditation, and that the offense was committed in an especially heinous, cruel, or depraved

manner. *See* Doc. 24. Given that the Superseding Indictment carried a potential penalty of death, the Court appointed learned counsel on August 6, 2024, in accordance with 18 U.S.C. § 3005. Doc. 27.

On December 18, 2024, a federal grand jury returned a "Second Superseding Indictment," charging 17 counts that correspond to 11 John Does: Count 1: 18 U.S.C. § 1201(a)(1): Kidnapping Resulting in Death; Count 2: 18 U.S.C. §§ 1153 and 1111: First Degree Murder; Count 3: 18 U.S.C. §§ 1153 and 1111: First Degree Felony Murder; Count 4: 18 U.S.C. §§ 1153 and 1201(a): Kidnapping Resulting in Death; Counts 5, 6, 9, 11, 13, and 14: 18 U.S.C. §§ 1153 and 1201(a): Kidnapping; Count 7: 18 U.S.C. §§ 1153 and 113(a)(1): Assault with Intent to Commit Murder; Count 8: 18 U.S.C. §§ 1153 and 113(a)(6): Assault Resulting in Serious Bodily Injury; Count 10: 18 U.S.C. §§ 1153, 2241, and 2246(2)(B): Aggravated Sexual Abuse; Count 12: 18 U.S.C. §§ 1153 and 113(a)(3): Assault with a Dangerous Weapon; and Counts 15, 16, and 17: 18 U.S.C. § 1201(a)(1): Kidnapping. Doc. 52. The Second Superseding Indictment, likewise, includes an identical "Notice of Special Findings" section in relation to Count 1.

On June 27, 2025, the United States filed a "Notice of Intent to Seek the Death Penalty Pursuant to Title 18 United States Code Section 3593." Doc. 75. The United States informed Defendant "that the circumstances of the offense charged in Count One of the Second Superseding Indictment are such that, in the event that Defendant is convicted of this offense, a sentence of death is justified, and the government will seek the sentence of death." *Id*.

On October 1, 2025, Defendant filed his Emergency Motion to Stay the Proceedings. Doc. 101. The Motion argues that as a result of the federal government shutdown, which occurred on the date the Motion was filed, "Learned Counsel and critical defense experts must severely limit or pause their representation of Labar Tsethlikai, leaving him stripped of rights guaranteed to him

by the United States Constitution." *Id.* at 1. Defendant describes that his defense team includes CJA-funded Learned Counsel and Mitigation Experts, and on July 3, 2025, the federal government ran out of funds to compensate CJA attorneys and experts. *Id.* at 2. Learned Counsel and some experts continued to work on his case with the idea that they would be paid when the budget was replenished on October 1, 2025. *Id.* The CJA-funded members of Defendant's team "can no longer continue to work for free or pay expenses out of their own pocket." *Id.* Additionally, "the members of Mr. Tsethlikai's defense team who work for the Federal Defender's Office are expected to stop being paid for their work unless a budget or continuing resolution is passed. With no funding for Mr. Tsethlikai's defense, no member of his team will be paid for their work – not attorneys, learned counsel, investigators, mitigation specialists, paralegals, or experts." *Id.* Defendant argues that his defense cannot operate without Learned Counsel and/or mitigation experts. *Id.* at 4-5.

Because of these funding issues, Defendant's attorneys have "grave concerns about the ability to effectively represent Mr. Tsethlikai as required by the Sixth Amendment and to uncover the necessary mitigating information for the jury to make the individualized determination with the "heightened reliability" required by the Eighth Amendment. *See Ford v. Wainwright*, 477 U.S. 399, 414 (1986) (Court's consideration of capital cases has been characterized by 'heightened concern for fairness and accuracy)." Doc. 101 at 11. Defendant argues that a "stay of the proceedings is required until funding for both CJA and Defender Services is adequately restored." He argues that the Court must stay the case to remedy the deprivation of his Sixth Amendment right to a meaningful defense. *Id.* at 12-14.

In response, the Government argues that Defendant's motion is merely a tactic to "delay justice." Doc. 104 at 1. The Government points out that the Federal Defender's Office has not filed a similar motion in any other case in the District. *Id.* at 8. The Government also argues that there

3

is no scheduling order for the guilt phase yet, and even if there was, "the remedy would be a motion to enlarge the impacted deadline or to continue the sentencing for a period of time after the guilt phase, but not to stay the case." *Id.* Next, the Government argues that defense counsel is being compensated because all federal employees with receive back pay for work that happens during the shutdown. *Id.* at 9. The Government also argues that as of the date of Defendant's Motion, the Federal Public Defender's Office was still being funded; the Government cites to a release from the Federal Judiciary that stated "The Judiciary initially confirmed that it could continue paid operations through Oct. 3, adding that it was assessing whether there were sufficient funds to support operations beyond that date. *The assessment identified available fees and balances to pay for an additional two weeks.*" *Id.* at 10.

Additionally, the Government argues that "Defendant misstates the concept of 'death is different.'"[1] *Id.* at 11. "Though the Supreme Court has indeed recognized the qualitative difference between death and alternative forms of punishment, the [death is different] principle has been articulated and applied in precise contexts, and has never been understood to color capital proceedings in the all-encompassing manner suggested by Defendant." *Id.* at 11. The Government adds that the United States has an obligation to prosecute Defendant, and victims have the "right to proceedings free from unreasonable delay." *Id.* at 13 (citing to the Crime Victims' Rights Act). Finally, the Government argues Defendant has "not identified one expert who cannot be retained." *Id.* at 14.

Having summarized the parties' arguments, the Court now turns to its analysis of the issues presented here.

---

[1] Defendant argues "although the issues raised in this pleading are, in varying degrees, applicable to non-capital cases, they must be analyzed here through a 'death is different' lens and do not have the same impact outside the capital context." Doc. 101 at 8.

## II. DISCUSSION

The Sixth Amendment guarantees that: "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held this to mean "that …. counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived." *Gideon v. Wainwright*, 372 U.S. 335, 339–40 (1963). Specifically,

> The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

*Id.* at 344. Moreover, the Supreme Court has clarified that defendants are also entitled to effective representation and given access to the tools necessary for a meaningful defense:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and *that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. *To implement this principle, we have focused on identifying the basic tools of an adequate defense or appeal, and we have required that such tools be provided to those defendants who cannot afford to pay for them.*

*Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) ((cleaned up) (emphasis added).

Furthermore, the role of mitigation work in capital cases is fundamental. "[T]he imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases . . . [and] far more important than in noncapital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). The American Bar Association has developed specific

guidelines for capital defense practice, and as Defendant argues, courts have routinely applied these guidelines when assessing the reasonableness of defense counsel's representation. *See* Doc. 101 at 7 (citing *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'"). The ABA Guidelines "require comprehensive records collection and multiple in-person meetings with clients and witnesses in both fact and mitigation investigation." Doc. 101 at 9 (citing to American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines") Guideline 10.7; American Bar Ass'n, Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008) ("Supplementary Guidelines"), Guideline 10.11). As Defendant outlines, the Supplementary Guideline 10.11 addresses the "requisite mitigation functions of the defense team," and these include:

> • undertaking an "ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record…or other factors which may provide a basis for a sentence less than death" 10.11(B);
> • conducting "in-person, face-to-face, one-on-one interviews" with biopsychosocial history witnesses or any witness "who would support a sentence less than death,"
> • "[m]ultiple interviews [which] will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation" 10.11(C);
> • uncovering comprehensive documentary evidence of the client's biopsychosocial history for counsel's use, 10.11(D);
> • aiding counsel with the selection and preparation of testifying witnesses, lay and expert, 10.11(E);
> • gathering documentary support for lay and expert witness testimony, including biopsychosocial history records, 10.11(F), and aiding counsel in gathering and preparing demonstrative evidence that "humanize the client or portray him positively" 10.11(G). "The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." Guideline 10.7 cmt.6.

Doc. 101 at 9. In addition, Defendant cites to a number of cases where, between 2000 and 2010, "the U.S. Supreme Court found trial counsel ineffective in multiple death-penalty cases for failing to conduct adequate mitigation investigation." Doc. 101 at 7.

None of the Government's arguments can eviscerate the clear holdings from the Supreme Court, the requirements for mitigation investigation in a capital case, and the Defendant's unequivocal right to the assistance of counsel. As Defendant summarized in his Reply, his defense team has been impacted in the following ways: Learned Counsel has received no compensation since before July 3, 2025 and has paid all case-related travel expenses out-of-pocket without reimbursement. Doc. 106 at 3. No mitigation expert has been paid since before July 3, 2025 and they have paid all case-related expenses out-of-pocket without reimbursement. *Id.* Because of the funding crisis, one essential, now-uncompensated team member has taken money from their retirement accounts to pay their own living expenses. *Id.* at 3-4. Another essential, uncompensated team member has had to focus their time on a different, paying case. *Id.* at 4. "[T]hat specialist has had to stop most of their work on Mr. Tsethlikai's case." *Id.* "If Congress does not pass a budget or continuing resolution by October 17, 2025, it is counsel's understanding that federal defender employees will then stop being paid for their work. Additionally, at that point, the federal defender's office will not be able to pay experts for their work." *Id.* A defense expert who was preparing to work on Defendant's case notified defense counsel they cannot work until the budget crisis is over. *Id.* The Court has no reason to doubt defense counsel's assertions and it cannot ignore the massive impact that the federal shutdown has had on Defendant's right to counsel.

The right to a defense is one of the bedrock principles of this country, and the shutdown has unquestionably impeded Defendant's right to counsel in this case. This deprivation of his

7

constitutional right to counsel is not outweighed by any of the interests cited by the Government. The Court therefore finds that Defendant's Motion to Stay these proceedings shall be granted.

**IT IS THEREFORE ORDERED** that Defendant's Emergency Motion to Stay (Doc. 101) is **GRANTED.**

**IT IS SO ORDERED.**

DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE